**Robert Bruce SPRINGER**

v.

**George COLLINS, Warden of the Maryland Penitentiary.**

**Civ. No. K–76–1084.**

United States District Court,
D. Maryland.

Dec. 29, 1977.

Roland Walker and Walker & McCadden, Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Maryland, and John P. Stafford, Jr., Asst. Atty. Gen. of Maryland, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

After waiving trial by jury, Springer was convicted on March 29, 1974 in the Circuit Court for Cecil County, Maryland, by Judge J. Albert Roney, Jr. of carnal knowledge of a girl under the age of fourteen years and additionally of distribution of secobarbital, amobarbital and methaqualone and of possession of secobarbital and marijuana. Springer was also charged in connection with certain other matters. As to them, Judge Roney either found Springer not guilty, or determined that merger had occurred with one or more of the charges of which he found Springer guilty. Herein, Springer seeks federal habeas corpus relief, contending that his trial counsel failed to investigate and/or raise an insanity defense.[1] The facts are in essence not disputed.[2]

On the night of September 2, 1973, at about 9:00 P.M., Springer visited the home of his girlfriend, the mother of the victim. During the course of that evening, Springer consumed certain drugs and alcohol and also induced his girlfriend and the victim to take drugs. Additionally, Springer made sexual advances toward the young girl who was then eleven years old and talked of

[1] Plaintiff unsuccessfully raised that contention in a post-conviction proceeding in the Circuit Court for Cecil County. Subsequently, he was denied leave to appeal by the Court of Special Appeals of Maryland. The State therefore appropriately concedes that Springer has exhausted state remedies as required by 28 U.S.C. § 2254. *See Jenkins v. Fitzberger*, 440 F.2d 1188 (4th Cir. 1971).

[2] Most of the relevant and material facts concerning Springer's within claim have been determined by Judge B. Hackett Turner, Jr. in the state post-conviction proceeding in the Circuit Court for Cecil County. However, to the extent that any relevant and material factual determinations were not so made by Judge Turner, they involve either uncontroverted facts which can be gleaned from the trial and post-conviction transcripts or facts stipulated by the parties in the within case.

having intercourse with her. Becoming alarmed, the girlfriend left her home, drove to the police station, and asked the police for assistance. Several officers returned to her house with her, where they found Springer and the victim lying seemingly unconscious and naked on a couch in the living room. The officers took several photographs of Springer and the victim, and then managed to awaken Springer. The latter refused to dress himself, and insisted upon remaining naked while being taken into custody. The daughter was taken to the hospital where it was ascertained that she had consumed drugs and had been sexually molested.

Thereafter, Springer retained, as his attorney, counsel who had been practicing law in Cecil County for 14½ years. That attorney had been involved in 20 or more serious felony cases, and in as many as four or five cases in which insanity defenses and psychiatric testimony had been involved. The attorney had known Springer for 8–10 years, and from those previous contacts, which were both business and social, knew of Springer's background, including Springer's use of drugs and alcohol. The attorney had also previously represented Springer in other criminal and civil proceedings. The records of the Cecil County Jail, in which Springer was confined between his arrest on September 3, 1973 and the commencement of trial on March 28, 1974, reflect that counsel conferred with Springer on three occasions during that period:

October 31, 1973, 5:35 P.M.—5:50 P.M. (15 minutes)

December 18, 1973, 5:15 P.M.—5:40 P.M. (25 minutes)

March 27, 1974, 1:45 P.M.—3:30 P.M. (1 hour 45 minutes)

In the course of those conferences and other trial preparation, counsel learned that:

(1) Springer had ingested a large quantity of tranquilizers (Tuinal and/or Quaa-lude) and of alcohol, and had also smoked marijuana, during the twelve-hour period prior to the incident.

(2) Springer described his mental state at and around the time of the incident as "messed up." During his investigation, Springer's counsel spoke to certain witnesses who confirmed that Springer's mental capacity at the time appeared to have been very seriously impaired and stated that they regarded such impairment as a manifestation of his being drunk and/or "stoned."

(3) Two days prior to the incident, Springer was involved in an automobile accident, apparently caused by his passing out while driving after having consumed large quantities of tranquilizers and possibly of alcohol as well. After that accident, Springer was arrested and confined overnight, and had his stomach pumped out.

(4) Springer had extensively used tranquilizers for at least six weeks, marijuana for at least two years, and alcohol for an indefinite period of time.

(5) Springer stated that he had no recollection of having committed the offense, or of having taken part in most of the alleged occurrences during the night of the incident.

(6) Springer informed his counsel that he had never previously done anything similar to the offense charged, or even entertained any thought thereof.

(7) Springer had been in the Marine Corps and had received something other than an honorable discharge.

(8) Springer had been twice convicted in the past of assault and battery, but not in connection with any occurrences similar to those herein involved.

Additionally, prior to trial, counsel was informed that Springer had held the same job for a number of years, and had never participated in any psychiatric examination, counseling or treatment.[3] Counsel knew of

---

**3.** Springer, during the post-conviction hearing, testified he had never considered participating in "Alcoholics Anonymous or any other program" and that he could not recall his trial counsel having asked him "to explain [his] background of drinking or to tell him when [he] started drinking." Post-Conviction Record at 66–68.

his own knowledge that Springer had consulted him on another legal matter a week or two prior to the incident and at that time had appeared normal.

In further preparing for trial, counsel obtained the hospital records pertaining to the diagnosis and treatment of the victim subsequent to the incident, but did not attempt to talk to any of the medical personnel so involved. Those hospital records reveal that sperm was present in the victim's vagina. Counsel also learned of the existence of the photographs taken by the police on the night of the incident. Additionally, counsel discussed the effects of the various substances Springer had ingested with a local doctor, in the course of a social conversation at a service club to which both belonged.

Prior to trial, counsel unsuccessfully attempted to obtain a satisfactory plea bargain from the prosecutor. Thereupon, he advised his client to elect a court trial, rather than a jury trial. At trial he attempted to raise doubt in the Court's mind regarding the occurrence of intercourse by suggesting that the hospital records were sloppily maintained and that Springer had "played with himself" but had subsequently inserted only his fingers into the victim's vagina. That latter argument was advanced in the absence of direct testimony regarding the occurrence of intercourse,[4] and in light of the generally known depressant effect on sexuality of large quantities of tranquilizers and liquor. During trial counsel also sought to raise doubt in the Court's mind as to whether the evidence showed the requisite degree of intent on Springer's part to support a carnal knowledge charge, contending that Springer was too intoxicated to have that intent and relying upon *State v. Gover*, 267 Md. 602, 298 A.2d 378 (1973), a case in which the Court of Appeals of Maryland held that intoxication is a defense to a *specific intent* crime.

Counsel did not, however, investigate or present an insanity defense. It is not clear whether the thought of that defense occurred to him, or whether he did not deem that defense to be appropriate for factual, tactical or other reasons. He did testify during the post-conviction hearing that he could not recall whether he had read the opinion of the Court of Special Appeals of Maryland in *Parker v. State*, 7 Md.App. 167, 178–79, 254 A.2d 381 (1969), *cert. denied*, 402 U.S. 984, 91 S.Ct. 1670, 29 L.Ed.2d 150 (1971). In that case, Judge Orth wrote that an alcoholic psychosis resulting from long continued habits of excessive drinking may under certain circumstances constitute an insanity defense. Further, defense counsel was apparently not aware, prior to trial, of the opinion of the Court of Special Appeals of Maryland in *Frank v. State*, 6 Md.App. 332, 251 A.2d 249 (1969), in which the Court held (at 334, 251 A.2d at 251) that the crime of rape does not "require proof of a specific intent to support a conviction" and (at 336, 251 A.2d 249) indicated by its holding that, in the absence of a plea of insanity, voluntary intoxication does not constitute a defense to such a charge. Rape was defined in *Frank* (at 337, 251 A.2d at 252) as "unlawful carnal knowledge of a woman without her consent  . . . ." That case was relied upon, at trial, by the prosecutor and subsequently by Judge Roney.

At trial defense counsel called the following witnesses:

(1) Springer, who testified about his ingestion of drugs and alcohol and his mental state at and around the time of the offense.

(2) Officer Ellis, of the Maryland State Police, who had taken Springer into custody in the early morning of September 1, 1973 after his automobile accident. Ellis testified to Springer's apparent mental and physical incapacitation at that time.

---

4. Neither the young victim nor Springer, who took the witness stand in his own defense, had any recollection of what occurred after a short time following Springer's arrival at his girlfriend's home at about 9:00 P.M. Nor did the girlfriend (the mother) who herself had become sick and had seemingly passed out or the like for at least some minutes testify to observing Springer do more than fondle the child's breasts, remove her clothes, feel between her legs and talk of having intercourse with her. The only other occupant of the home, the seven-year old son and brother, was apparently asleep and was not called to testify at trial.

(3) Deputy Beck, of the Sheriff's Department of Cecil County, who testified that late on September 3, 1973, some 18 hours after the incident, Springer was still incoherent. Deputy Beck also testified that, based on his training in connection with drug enforcement duties, it was his opinion that combining alcohol with barbiturates or amphetamines tripled the impact of the drugs.

Judge Roney found that intercourse had taken place between Springer and the young victim. During legal argument concerning the defense of lack of requisite intent, the State cited *Frank*. Judge Roney, referring to that case, commented (Trial Record at 300–01):

Now then, the question comes up as to intent, and the case cited by the State's Attorney, the issues in that case, and I quote "Does the crime of rape require proof of a specific intent to support a conviction?" And The Court held that it does not.

And in discussing that, they said that it is not required in an offense of this kind where the intent is presumed from the very nature of the act; a person having committed the act, that the intent is presumed.

Now, what they refer to, when you refer to a lacking of any intent, is a lacking of any intent, specific intent, and when intoxication might be a defense is in the case of an armed robbery or something of this nature. They make a distinction there and say if a person was intoxicated to the extent that he was insane, then that's a good defense. Otherwise, it's got to be to the point of insanity practically to be a good defense.

So, I find that he was not sufficiently under the influence of these drugs, that he cannot escape responsibility for this act, and that there was the intent to commit the act inferred from the very fact that he was able and did commit the act upon the child.

So that for that reason, these reasons, I find him guilty on [the carnal knowledge count].

Judge Roney subsequently sentenced Springer to 30 years' imprisonment which term he is presently serving.

Prior to the trial defense counsel had informed his client that if there was a conviction, he would not handle the case on appeal, since he did not have the time to do appellate work. On the day Springer was sentenced, however, his trial counsel did know the name of the attorney Springer was going to ask to handle the appeal and helped Springer look up the name and address of that lawyer. The latter decided that an appeal would be fruitless, since he believed that the law was clear that intoxication does not constitute a defense in a rape case unless insanity is shown, and since the record developed at trial did not contain evidence on the insanity issue. Therefore, Springer's new counsel filed a post-conviction petition in state court based on the same ground as the within petition, along with a petition for a psychiatric examination. Both petitions were denied by Judge Turner, sitting in the Circuit Court for Cecil County. Judge Turner also declined to hear testimony, proffered by Springer's post-conviction counsel, from Dr. Alan S. Greenberg, a neuropsychiatrist with "considerable experience" in alcohol and drug problems, who testified before Judge Turner that he had interviewed Springer and Springer's mother but had not had Springer as a patient. Judge Turner so declined because he concluded that there was no reason for trial counsel to have considered an insanity plea, and that additionally trial counsel had rejected an insanity defense because trial counsel did not deem the assertion of that defense to be a proper tactic in the case. Essentially adopting Judge Turner's views, the Court of Special Appeals of Maryland denied Springer's application for leave to appeal. *Springer v. Warden, Maryland Penitentiary*, No. 49 (Ct. Spec.App. of Md., filed July 17, 1975).

Represented by his state post-conviction counsel, Springer instituted this federal habeas corpus proceeding. Herein, counsel for both sides have agreed that this Court should consider a written statement of Dr.

Greenberg, filed in this proceeding, as opinion testimony. In substance, Dr. Greenberg has given his opinion that at the time of the incident Springer was insane, under the standards set forth in Md.Ann.Code art. 59, § 25. That statute is based upon the American Law Institute test. In so concluding, Dr. Greenberg has stressed Springer's unstable personality, his family history, his father's problems with alcohol, his own long-standing drinking problem, his daily heavy use of drugs and alcohol for two years prior to the incident, his recurrent amnesia, and his disoriented behavior at the time of the incident.[5]

The standard for determining when counsel's representation has been ineffective has recently been explicated as follows by Judge Butzner in *Marzullo v. Maryland*, 561 F.2d 540, 543–44 (4th Cir. 1977):

> [W]e adopt as an appropriate measure: Was the defense counsel's representation within the range of competence demanded of attorneys in criminal cases? [Citation omitted.]

By this standard, effective representation is not the same as errorless representation. An attorney may make a decision or give advice which in hindsight proves wrong. Such errors, as *McMann* [*v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)] pointed out, are not necessarily grounds for post-conviction relief. 397 U.S. at 770–71, 90 S.Ct. 1441.[7]

[7] *See also Moore v. United States*, 432 F.2d 730, 737–38 (3d Cir. 1970).

A convict generally must establish that his counsel's error was so flagrant that a court can conclude that it resulted from neglect or ignorance rather than from informed, professional deliberation.[8]

[8] *See* Stone, Ineffective Assistance of Counsel and Post-Conviction in Criminal Cases: Changing Standards and Practical Consequences, 7 Col.Human Rts.L.Rev. 427, 435 (1975). Sometimes, the denial of effective assistance of counsel does not result from neglect, ignorance, or any other fault of defense

counsel. For example, a trial court may deprive an accused of effective representation by making a tardy appointment of counsel. *See, e. g., Fields v. Peyton*, 375 F.2d 624 (4th Cir. 1967).

The *McMann* normal competency standard is similar in many respects to those which judges must apply in other contexts.[9] Moreover, because it measures an

[9] The normal competency test bears a close resemblance to the standard set forth in Restatement (Second) of Torts § 299A (1965), for professional competence:

> Undertaking in Profession or Trade
> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

*See, generally,* Bines, *supra* note 2, 59 Va.L. Rev. at 937.

attorney's conduct by comparison with the competence generally found in the profession, it requires an objective assessment of counsel's adequacy.[10] While the

[10] *See* Bines, *supra* note 2, 59 Va.L.Rev. at 938–39.

normal competency standard does not purport to list the things counsel should or should not do, it does not preclude resorting to specifics for ascertaining the "range of competence demanded of attorneys in criminal cases." For example, in *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir. 1968), we said:

> Counsel for an indigent defendant should be appointed promptly. Counsel should be afforded a reasonable opportunity to prepare to defend an accused. Counsel must confer with his client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are unavailable. Counsel must conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow

5. Dr. Greenberg, who noted that he had knowledge of the testimony before Judge Turner as well as from his interviews with Springer and the latter's mother, concluded that Springer "was suffering from an alcoholic psychosis at the time of the commission of the crime" and

that "[s]uch episodes of alcoholic psychosis render the patient substantially unable to appreciate the criminality of their actions or to conform their actions to the requirements of the law."

himself enough time for reflection and preparation for trial.

We adhere to this statement, for it is a definitive, objective description of the competency normally demanded of counsel in certain aspects of their service.

The normal competency standard is necessarily broad and flexible because it is designed to encompass many different factual situations and circumstances. Consequently, its fair and effective administration rests primarily on the district judges. Speaking for the Court in *McMann* on this subject, Mr. Justice White said:

> [W]e think the matter, for the most part, should be left to the good sense and discretion of the trial courts with the admonition that if the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and that judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts. 397 U.S. at 771, 90 S.Ct. 1441.

In exercising its discretion a trial court may refer to other sources to determine the normal competency of the bar. Among these are precedent from state and federal courts, state bar canons, the American Bar Association Standards Relating to the Defense Function [App. Draft 1971], and in some instances, expert testimony on the particular conduct at issue.[6] These of course, do not supplant the test that we have prescribed, but they can aid in objectively ascertaining the range of competency normally expected of attorneys practicing criminal law.[7]

Judge Butzner also made clear in *Marzullo* that the test was intended to be similar to that adopted by the Third, Fifth, Sixth, Seventh, Eighth and District of Columbia Circuits, and to be stricter than the "farce and mockery of justice" standard set forth in certain Fourth Circuit opinions rendered prior to *Marzullo* and by certain other courts.

*Marzullo* did not deal with the possible assertion of an insanity defense.[8] However,

---

**6.** ABA Standards Relating to the Defense Function § 3.6(a) (1971) reads as follows:

> Many important rights of the accused can be protected and preserved only by prompt legal action. The lawyer should inform the accused of his rights forthwith and take all necessary action to vindicate such rights. He should consider all procedural steps which in good faith may be taken, including, for example, motions seeking pretrial release of the accused, *obtaining psychiatric examination of the accused when a need appears*, moving for a change of venue or continuance, moving to suppress illegally obtained evidence, moving for severance from jointly charged defendants, or seeking dismissal of the charges. [Emphasis added.]

The Commentary thereto states, in part:

> The particular procedural steps which should be taken to protect the rights of the accused will vary greatly from case to case. The Committee particularly rejects any implication that a lawyer is obligated to take every step which the accused demands unless in his professional judgment it has some utility in the particular case. His professional judgment that the particular step can be appropriately invoked in the case to his client's advantage should govern. See § 5.2 *infra*. Among the obvious steps to be considered at once are motions for pretrial release, for con-

tinuance of the preliminary hearing if that will benefit the accused, for suppression of evidence if grounds exist, for change of venue if that will benefit the accused, or for *pretrial psychiatric examination if any reason for such examination appears.* * * * [Emphasis added.]

**7.** *Marzullo* does not suggest any distinction between retained and appointed counsel for purposes of the effective assistance issue. *Cf. Deas v. Potts*, 547 F.2d 800 (4th Cir. 1976) (per curiam); *Stem v. Turner*, 370 F.2d 895, 896, 900 (4th Cir. 1966). *But see Fitzgerald v. Estelle*, 505 F.2d 1334, 1335–38, 1344 *et seq.* (5th Cir.) (en banc), *cert. denied*, 422 U.S. 1011, 95 S.Ct. 2636, 45 L.Ed.2d 675 (1975). Springer's counsel was retained by him. For reasons discussed in the body of this opinion, even if a less stringent standard pertains to retained counsel than to court-appointed counsel, Springer's counsel failed to meet standards applicable to all defense counsel.

**8.** In *Marzullo*, the prosecuting witness, *i. e.*, the victim of an alleged rape, stated to the trial judge in the presence of the voir dire panel that she could not identify the defendant as her attacker. The prosecutor responded that she had previously said she could identify him.

the issue of whether counsel failed to provide competent representation because of failure to investigate or suggest an insanity defense has been present in other cases. One such case is *United States v. Fessel*, 531 F.2d 1275 (5th Cir. 1976), in which Judge Wisdom wrote (at 1276–79):

Fessel was committed to a mental hospital in New Jersey in April 1973, after an automobile accident. May 1, 1973, against medical advice, he left the mental hospital.

In July 1973, three months later, Fessel was arrested at the United States-Mexico border and charged with attempting to import marijuana in violation of 21 U.S.C. § 952(a). On the advice of court-appointed counsel, the defendant pleaded guilty, but sentence was deferred pending observation and study under the Youth Corrections Act. 18 U.S.C. § 5010(e). Based on a report submitted to the district court by the Bureau of Prisons following two extensions of the normal observation period, the trial judge held a hearing to determine Fessel's mental competency at the time his guilty plea was entered. The trial judge found that the defendant had been incompetent at the time, set aside the plea, and committed him to the custody of the Attorney General for confinement and observation under 18 U.S.C. § 4246, "until the accused shall be mentally competent to stand trial". Over the next several months, Fessel was observed and treated by staff psychiatrists at medical centers for federal prisoners at El Reno, Oklahoma, and Springfield, Missouri.

In August 1974, five months after his commitment under § 4246, and about one year after the alleged offense, Fessel moved for a speedy trial, asserting that he was then competent to stand trial. By order of the court, he was examined by Dr. John C. Sparks, a psychiatrist at Lackland Air Force Base who determined that the defendant was then competent to face trial. He was reindicted in November for possession with intent to distribute and importation of marijuana. 21 U.S.C. §§ 841(a)(1), 952(a), 960(a)(1). The court ordered a competency hearing held on December 17 and, based on Dr. Sparks' report and testimony, declared Fessel competent to stand trial. Trial was set for two days later.

Shortly after trial commenced, the defendant's court-appointed counsel informed the court that Fessel wished to defend himself. The court permitted him to do so, with counsel serving in an advisory capacity, but denied his request that he be permitted to find another attorney. The following morning, Fessel filed a formal motion for a continuance, arguing that he had not known until two days before that he would be going to trial that day, and that his repeated requests to his attorney to secure important psychiatric information had proven unavailing. Specifically, Fessel stated that he needed the live testimony of certain government staff psychiatrists who had examined him during his recent confinement at the El Reno and Springfield facilities, as well as the records of a private psychiatrist who had examined and treated him during his confinement in a New Jersey mental institution shortly before his arrest. The trial judge, concluding that the motion was "purely for delay", denied the request, but indicated that the defendant would be permitted to read from any reports prepared by government psychiatrists during his confinement at El Reno and Springfield.

In the course of trial, the appellant did read from reports prepared by staff psychiatrists, but presented no live expert testimony in his favor. His attorney had neither deposed nor subpoenaed the rec-

The rape charge was dismissed. Whereupon, the prosecutor called a second case involving rape and rape-related charges against the same defendant which were seemingly not connected with the alleged occurrences in the first rape case. Defense counsel agreed to waive the fact that the panel from which the jury in the second case was chosen heard all of the above. The defendant was convicted but was held entitled by the Fourth Circuit to federal habeas corpus relief because of incompetence of his trial counsel during the voir dire proceedings.

ords of the New Jersey doctor who had examined the defendant shortly before his arrest. The only live expert testimony was that of Dr. Sparks, who stated his conclusion, based on recent examinations, that Fessel was then competent to stand trial and had been competent at the time of the offense.

Thus, the jury had before it the live testimony of only one expert witness, Dr. Sparks, whose testimony was clearly adverse to the defendant. Jurors were not permitted to consider either the reports of the one doctor who had examined Fessel shortly before his arrest, nor the testimony of the staff doctors from El Reno and Springfield who had examined him in the months following his arrest, and whose reports indicated that their testimony would have supported the defendant's claim of incompetency.

The same day the trial began, the jury returned its verdict, finding the defendant guilty on the first count of importation and not guilty on the second count charging possession of marijuana with intent to distribute.

I.

Inadequacy of Counsel

On appeal, Fessel's first challenge to the verdict below rests on the allegedly inadequate representation provided by his court-appointed counsel. The appellant contends that the failure of his attorney to prepare an insanity defense by showing his probable incompetence at the time of the offense violated his Sixth Amendment right to effective assistance of counsel. Specifically, Fessel cites his attorney's failure to move, under 18 U.S.C. § 3006A(e) for a court-appointed psychiatrist to assist in the preparation of an insanity defense. This failure, Fessel contends, deprived him of psychiatric testimony necessary to the preparation of his defense, and thus fell below the minimum level of representation guaranteed by the Sixth Amendment. We agree with this contention.

The standard for determining adequate assistance of counsel under the guarantees of the Sixth Amendment has been stated by this Court on numerous previous occasions. In *MacKenna v. Ellis*, 5 Cir. 1960, 280 F.2d 592, *cert. denied*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78, we rejected the "mockery of justice" standard; we defined "effective counsel" in terms of a "reasonable counsel" standard:

We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance.

The Court has reaffirmed this principle in a number of decisions. See, for example, *Herring v. Estelle*, 5 Cir. 1974, 491 F.2d 125, 127, see esp. n. 4 at 127; *United States v. Edwards*, 5 Cir. 1974, 488 F.2d 1154, 1163.

This Court has repeatedly stressed the "particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel." *United States v. Edwards*, 488 F.2d at 1163. In *Edwards*, this Court noted the importance of psychiatric assistance provided by a psychiatrist appointed under § 3006A(e). There we found ineffective assistance of counsel when the defendant's attorney had moved for a § 3006A(e) appointment, but had failed to pursue the motion after the district court mistakenly treated the resulting report as a § 4244 report. In *United States v. Hamlet*, 5 Cir. 1972, 456 F.2d 1284, we held that a psychiatrist appointed by the court under § 4244 to determine the present competency of the defendant to stand trial "falls short of fulfilling the role of an expert selected under § 3006A(e) whose responsibility is to assist the defense". There we held that the trial judge's refusal to grant the § 3006A(e) motion denied the defendant a fair trial and constituted grounds for reversal.

These cases—others could be cited—illustrate the principle that when an insanity defense is appropriate and the defendant lacks funds to secure private psychi-

atric assistance, it is the duty of his attorney to seek such assistance through the use of § 3006A(e). This assistance is required whenever the services are "necessary to the preparation and presentation of an adequate defense." *United States v. Chavis*, 1973, 155 U.S.App.D.C. 190, 476 F.2d 1137, 1143, cited with approval in *United States v. Edwards*, 488 F.2d 1162 at n. 6; *see United States v. Theriault*, 5 Cir. 1971, 440 F.2d 713, 715, *cert. denied*, 1973, 411 U.S. 984, 93 S.Ct. 2278, 36 L.Ed.2d 960. In the instant case, there could be little doubt as to the appropriateness of an insanity defense and the need for psychiatric assistance to prepare it. The evidence showing Fessel guilty of committing the acts charged was virtually uncontested. The only issue for the jury to consider therefore was the sanity of the defendant at the time of the offense. In the absence of live psychiatric testimony favorable to the defendant, the need for a § 3006A(e) motion was manifest. In these circumstances, we hold that the failure of counsel to utilize § 3006A(e) denied the accused services "necessary to the preparation and presentation of an adequate defense", and thus denied him the minimally effective representation guaranteed by the Sixth Amendment. [Footnotes omitted.]

Judge Wisdom also held (at 1281) that the refusal of the trial court to grant a continuance constituted an abuse of discretion and reversible error.

In *United States v. Edwards*, 488 F.2d 1154 (5th Cir. 1974), the District Court, at the request of defense counsel, appointed a psychiatrist pursuant to 18 U.S.C. § 3006A(e) to aid defense counsel in preparing his defense, including determination of whether or not to raise an insanity defense. The psychiatrist, after examining Edwards, found various psychiatric problems but concluded that Edwards was "competent" both at the time of the alleged offense and to stand trial. The Fifth Circuit concluded, on appeal after conviction, that defense counsel had rendered ineffective assistance, stating (at 1163–65):

Did counsel make some unexplained and indiscernible strategic decision not to follow through on the court's grant of his motion? Or did counsel fail to understand or appreciate the significance of his client's rights under this part of the Criminal Justice Act? Regardless of which conjecture is correct, did this inaction amount to deprivation of Sixth Amendment assistance of counsel? The answer is not easy.

\* \* \* \* \* \*

This court has long recognized a particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel. For example, in *Bush v. McCollum*, 344 F.2d 672 (5th Cir. 1965), we held that a state defendant, who had previously been adjudicated insane and whose pre-trial motions for institutionalization or appointment of a psychiatrist were denied, was deprived of both a fair trial and effective assistance of counsel when the state court found him guilty and sentenced him to life imprisonment without the benefit of any psychiatric testimony. In so ruling, we approved the following language in the district court's opinion:

In order for Bush in the instant case to have the effective aid of counsel, it was necessary for his counsel to have the assistance of a qualified psychiatrist and a trial, without expert evidence as to sanity, which found him sane and resulted in a life sentence is so lacking in fairness as to be a denial of liberty without due process of law, contrary to the Fourteenth Amendment.

231 F.Supp. 560, 565 (N.D.Tex.1964).

Similarly, in *Hintz v. Beto*, 379 F.2d 937 (5th Cir. 1967), the trial court denied the motion of a defendant, who had a long history of mental instability, for continuance despite the fact that his counsel did not receive the results of a psychiatric examination of the defendant until the trial was about to commence. We held that the right to counsel afforded under the Sixth Amendment means the effec-

tive assistance of counsel and effective assistance requires time for preparation. The *Hintz* court stated: "Time for preparation, where mental competency is in question and there is a fair factual basis as here for the question, would at least include a reasonable time within which to have a defendant examined, and for preparation of such defense as might be based on the facts developed by the examination." 379 F.2d at 941. Further, we expressed the view that even the report of an examination which concludes that the defendant is sane "may not obviate defendant's Federal constitutional right to have a lawyer who has an opportunity to prepare his defense and that this right would include time for studying and evaluating the report." 379 F.2d at 942.

Finally, we are guided by *Greer v. Beto*, 379 F.2d 923 (5th Cir. 1967). Greer had a long history of mental instability. He was found to be sane by a jury at a preliminary sanity trial on the basis of the expert testimony of a medical doctor not formally trained in psychiatry. Greer was represented by a different court-appointed attorney at the subsequent trial on the merits. We found that a prima facie case of inadequate assistance of counsel had been established based upon (1) his trial attorney's failure to offer medical testimony after the issue of defendant's sanity was submitted to the trial jury, (2) counsel's introduction into evidence of the jury verdict in the sanity trial, and (3) counsel's complete lack of knowledge about the defendant's prior psychiatric examinations.

Consistent with these principles, other circuits as well as our own have evaluated whether counsel for mentally suspect defendants erred in failing to investigate or pursue a defense of insanity or incompetency to stand trial by appraising the facts known and available or with minimal diligence accessible to defense counsel and determining whether those facts raise reasonable doubt as to the defendant's mental condition. In many cases, of course, trial tactics could dictate an attorney's decision not to rely upon or advance an insanity defense. Courts hesitate to fault such decisions by facile hindsight, because opinions could readily differ between lawyers and judges as to the proper strategic course to follow in varying circumstances.

In the present case, however, the error attributed to Edwards' counsel lies not in any failure to present the insanity defense at trial—a decision that may have been dictated by Dr. Jackson's report—but in failing to pursue his successful Section 3006A(e) motion and to object when subsequent proceedings made it evident that the court was treating the matter as though it arose under Section 4244. The result was that Edwards, who had been adjudged to be statutorily entitled to the benefit of psychiatric help under the Criminal Justice Act, received only a portion of the assistance that was the predicate for the initial request his counsel addressed to the court. Moreover, the doubts about Edwards' mental competency that counsel himself had raised in his affidavit supporting the motion simply could not have been so clearly resolved by the report of Dr. Jackson's examination as to justify a complete abandonment of the § 3006A(e) motion.

We are unwilling to hold that Edwards' counsel was so lacking in ability as to make his trial a farce, a sham or a mockery of justice. The record reflects, much to the contrary, that his representation was professional and adequate. The problem reduces itself to that part of the record related to the critical issue of sanity and more narrowly to adequate psychiatric assistance in relation to that issue. In the cold light of the written record of this proceeding we cannot say that Edwards received "counsel reasonably likely to render *and rendering* reasonably effective assistance." Accordingly, we reverse his convictions and remand his case to the district court for a new trial. [Footnotes omitted.]

In *Brooks v. Texas*, 381 F.2d 619 (5th Cir. 1967), a case involving an assault with intent to rape, Judge Rives, in the course of

holding that defendant was denied the effective assistance of counsel, wrote (at 620):

> The testimony of the prosecutrix, her positive identification of Brooks, another witness' equally positive identification of Brooks as he left the prosecutrix's room, the circumstances of Brooks' flight from the rooming house, and Brooks' own written confession made it clear that there was no reasonable possibility of a successful defense except on the ground of insanity. * * *

In *Brubaker v. Dickson*, 310 F.2d 30, 35 (9th Cir. 1962), *cert. denied*, 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963), trial counsel was aware of petitioner's "history of head injury and extended unconsciousness and of the heavy drinking that occurred on the night of the homicide." Nevertheless, trial counsel failed to investigate and/or present either an insanity defense or a diminished capacity defense. Judge Browning stated (at 38), that "[t]he defense actually tendered was so insubstantial in relation to those not offered as to cast doubt upon the hypothesis that trial counsel made a deliberate informed choice." Counsel's failure to explore the raising of the defense of insanity or of diminished capacity was one of several failures in that case.

In *Fessel, Edwards, Brooks* and *Brubaker*, defense counsel were all found to have failed adequately to investigate and raise insanity or related questions and therefore to have provided ineffective assistance under a *Marzullo*-type standard. In one or more of those cases, there were evidence of mental problems, existing either prior to or at the time of the offense, known or reasonably ascertainable by trial counsel; absence of other substantial and inconsistent defenses; and pendency of serious charges.

By way of contrast, in *United States ex rel. Martin v. Brierley*, 464 F.2d 529, 530 (3d Cir. 1972) (per curiam), *cert. denied*, 410 U.S. 943, 93 S.Ct. 1379, 35 L.Ed.2d 610 (1973), the Court wrote:

> It is true that the petitioner's trial counsel testified that they did not consider the defense of insanity. But this statement must be viewed in the light of the fact that the petitioner had consistently asserted that his commitment to Farview [State Hospital] in 1961 was erroneous and expressed his fear of being returned there, that he prohibited his appellate counsel from raising this issue on his appeal to the Superior Court of Pennsylvania, although the latter did actually raise it but the Superior Court nonetheless affirmed his conviction, and that even now he does not say that he would have approved using the defense of insanity if it had been suggested to him by counsel, but merely that he should have been given the opportunity to approve or reject it. We need not decide whether the Superior Court by affirming the petitioner's conviction has adjudicated this issue on the merits. For under the circumstances of this case, we think that it would have been a meaningless gesture for his trial counsel to have made the suggestion of an insanity defense to him merely in order to give him the opportunity to reject it. The district court rightly held that the petitioner was not deprived of the effective assistance of counsel.[9]

The Fourth Circuit has dealt with similar issues in a pre-*Marzullo* context. *Owsley v. Peyton*, 368 F.2d 1002 (4th Cir. 1966) (per curiam), involved trial counsel's alleged failure to develop and present evidence estab-

---

**9.** Cf. *De Kaplany v. Enomoto*, 540 F.2d 975 (9th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977); *Heard v. United States*, 136 U.S.App.D.C. 100, 419 F.2d 682 (1969) (per curiam). *See also* the following cases in which the farce and mockery standard was applied: *United States v. Stern*, 519 F.2d 521, 524–26 (9th Cir.), *cert. denied*, 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975); *United States ex rel. Marcelin v. Mancusi*, 462 F.2d 36, 39–45 (2d Cir. 1972), *cert.* denied, 410 U.S. 917, 93 S.Ct. 977, 35 L.Ed.2d 279 (1973); *United States v. Spenard*, 438 F.2d 717, 720 (2d Cir. 1971); *Daugherty v. Beto*, 388 F.2d 810, 812–13 (5th Cir. 1967), *cert. denied*, 393 U.S. 986, 89 S.Ct. 461, 21 L.Ed.2d 447 (1968); *Nicholson v. Sigler*, 325 F.Supp. 957, 960–63 (D.Neb.), *aff'd*, 448 F.2d 777 (8th Cir. 1971), *cert. denied sub nom. Nicholson v. Wolff*, 405 U.S. 1043, 92 S.Ct. 1327, 31 L.Ed.2d 585 (1972).

lishing incompetency to stand trial. The Court held (at 1003):

> The State is quite right that no evidential showing was made to the criminal court of any doubt as to Owsley's mental condition. However, it appears that his attorney must have been aware that proof of the uncertainty was at hand. The lawyer's failure to adduce it in court, we think, rendered his representation of Owsley ineffective to the point of depriving him of his Constitutional right to counsel.

In *Caudill v. Peyton*, 368 F.2d 563 (4th Cir. 1966), a habeas petitioner who had been convicted of first degree murder contended, *inter alia*, that his counsel had failed to investigate his competency to stand trial or the possibility of stating an insanity defense. Judge Bell, while refraining from passing finally on the issue because an independent trial court error required that the case be remanded, did discuss the issue thoroughly (at 564–65):

> We think the case raises serious questions both as to the lack of counsel at the critical stage in the proceedings when the petitioner was committed to a state hospital for 60 days, cf. *Timmons v. Peyton*, 360 F.2d 327 (4 Cir. 1966), and the adequacy of his representation at the in-chambers trial before the judge. The questions with respect to the trial fall into two broad categories: first, whether the defendant had the mental capacity knowingly and intelligently to waive his right to indictment and his right to a trial before a petit jury, and secondly, whether he had constitutionally adequate service of counsel in permitting him to waive these rights and in failing to raise the questions of his client's capacity to stand trial or his mental status at the time he committed the alleged offense. Neither his own counsel nor any of the state's witnesses who testified at the state and federal habeas hearings was willing to make the statement that he felt certain Caudill understood the significance of his conduct before or at the trial. His trial counsel, who testified for the state on direct examination at the federal habeas hearing, said:

> "I personally have some reservations, I did then and I do now, about George's capacity. But I thought that he was, at the time I was talking to him, it appeared to me he understood what we were talking about."

> Yet in the face of this doubt, no question of the defendant's sanity at the time of the offense or his capacity to stand trial was raised by his counsel. At the state habeas hearing the prosecuting attorney stated that he had known the petitioner for years and believed him to be "subnormal," and for that reason had had him committed to the mental institution for examination. It is true that the state mental institution reported that Caudill was neither insane nor psychotic at any time while he was in the hospital and that he was competent to stand trial. It was on the strength of this report that defense counsel "justified" his failure to raise either issue at the trial. It is apparent, however, that had the attorney sought the advice of an expert he would have found that the Wechsler test score contained in the report itself raised serious question concerning his client's mental status which should have been raised at the trial in defending his client on a first degree murder charge under Virginia law. We also point out that the report in question purported to deal and did deal only with the petitioner's capacity to stand trial and not with his mental status with respect to the crime—two separate and distinct standards. Furthermore, this letter report was merely hearsay evidence which though it might justify the court in proceeding to trial, would not, of course, in any respect be definitive of either issue at the trial itself. Cf. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). [Footnote omitted.]

On the other hand, in *James v. Boles*, 339 F.2d 431 (4th Cir. 1964), the Court held that effective assistance of counsel had been rendered to petitioner, even though the latter's trial counsel was aware that petitioner had been committed to a mental hospital

for a short time not long before the commission of the offense and did not raise an insanity defense. In so holding, the Court stated (at 433):

It was shown that the petitioner's attorney, although aware of petitioner's commitment to the state hospital, did not raise the defense as he was advised, and justifiably believed, that petitioner's short stay in the mental hospital was the result of spitework on the part of his wife. Also, petitioner's attorney was of the justified opinion that petitioner was not suffering from any mental incapacity either at the commission of the crime or during trial.

\* \* \* \* \* \*

We have examined the petitioner's testimony at the time of his state court trial. It is lucid and coherent. Viewed in the light of the testimony taken in the District Court, it clearly warranted the finding that James was competent to stand trial and was thoroughly able to assist his attorney in his own defense and to actively and helpfully participate in it. It tends to support, too, the District Judge's finding that the petitioner's representation in the trial court by his employed counsel was not so deficient as to amount to a constitutional defect. The attorney would have protected himself from this sort of charge had he sought in advance of trial an examination of the defendant for the purpose of current findings as to his capacity to stand trial, but the testimony in the habeas corpus proceedings leaves no doubt about the outcome of such an inquiry if it had been made before trial. Finally, the minimal nature of the mental defect, considered in the light of his attorney's knowledge of his client and the background of his commitment to the hospital, justifies the District Court's ultimate finding that the trial attorney was not greatly neglectful of his responsibilities when he presented no defense based upon his client's mental condition at the time the crime was committed, a defense which the petitioner disclaimed and which may have been thought to have been of possible prejudice to the real defense, which was emphatically presented, that there had never been any criminal conversation with the prosecutrix.

As the findings of the District Court are not clearly erroneous, the Court's order is affirmed.

Similarly, in *Snider v. Cunningham*, 292 F.2d 683 (4th Cir. 1961), in which counsel had not pursued a possible insanity defense, Judge Haynsworth concluded (at 685–66):

While the prisoner now relies upon his history of sexual excess and depravity, including the crime of which he was convicted, to show his mental derangement, at the time of trial he insisted that he had not committed the crime. He sought to establish an alibi. At the time of the trial, therefore, his counsel based the defense upon the contention that he was not present and did not commit the crime. Since the physicians who had examined him were prepared to testify that he was not of unsound mind, they could hardly have developed a defense of insanity without admitting this and other sexual crimes, which, collectively, may well suggest a deranged mind, or very poor control of his conduct. A prisoner who insists that he did not commit a crime can hardly be forced by his counsel to confess it in order to support a tenuous defense of insanity.[6]

[6] The medical evidence in the District Court suggests little or no control of his sex urges in the presence of a female under his control in a secluded place. The doctors all agree he could and did control such urges in the presence of others. The testimony at the trial was that he forced a little girl into his automobile after blocking her passage through an alley in Roanoke. He then drove to a secluded spot where the attack occurred. En route he had compelled her to commit certain acts for the purpose of exciting his genitals. The circumstances suggest that the crime was planned at a time when his controls were not at their lowest. These facts make the defense that he acted on an irresistible impulse less appropriate than it might have been had he first encountered the child under other circumstances.

At the time of his trial the prisoner was represented by an attorney appointed by the court, assisted by another attorney from Gadsden, Alabama employed by

the defendant's parents. The depositions of these attorneys were taken in connection with the hearings in the District Court. The privately employed counsel thought the attorney appointed by the court, who took the lead in the defense, was a good lawyer, and he found no fault with what the court appointed counsel did in the preparation or trial of the case. The privately employed attorney arrived in Roanoke only on the evening preceding the day before the 3-day trial commenced. There was no motion for a continuance, or anything to suggest that the defendant and his attorneys were not prepared for trial. Indeed, the court appointed attorney said that he had completed his preparation before the trial commenced, and there is every indication that the prisoner was fairly tried and adequately represented by his two attorneys. If someone now may think that the defense would have stood a better chance if the unwilling defendant had confessed the crime and pleaded insanity, it shows no such neglect of their client's interest or lack of skill on the part of the attorneys as to make the proceedings so unfair that they may be said to have been wanting in due process. [Footnote 7 omitted.]

In *Wood v. Zahradnick*, 430 F.Supp. 107 (E.D.Va.), *appeal docketed*, No. 77–1627 (4th Cir. 1977), defendant had had no record of psychiatric treatment prior to the offense. Judge Merhige wrote (at 111–12), prior to *Marzullo*, concerning whether defense counsel should have raised before or during trial the issues of competency-to-stand trial and insanity at the time of the commission of the alleged offense:

An attorney's duty, of course, does not mandate the exploration of the issues of sanity and/or competency in every instance. *Cf. Hawks v. Peyton*, 370 F.2d 123 (4th Cir. 1966); *Wieringo v. Riddle*, 418 F.Supp. 48 (W.D.Va.1976). Where, however, the facts known and available, or with minimal diligence accessible, to defense counsel raise a reasonable doubt as to a defendant's mental condition, counsel has an affirmative obligation to make further inquiry.

In the instant case, the crime itself was of such a bizarre nature as to call into question the petitioner's mental condition. A 27-year old man, for no apparent reason, raped, robbed and brutally beat a 67-year old woman who he had known his entire life. The trial transcript is devoid of any suggestion as to the petitioner's motive for these bizarre actions. The petitioner claimed to have no recollection of the crime, or even of his arrest. He did confess to drinking and taking heroin on the night in issue. As noted earlier, with reasonable effort, counsel could have discovered that his client had sexual intercourse on two occasions on the night in question and that heroin generally depresses rather than stimulates one's sexual appetite. Counsel himself observed the petitioner to be confused, unresponsive and suffering from withdrawal symptoms. With minimal effort, counsel could have learned of the petitioner's low I.Q. scores. These facts, which were either known or ascertainable with reasonable diligence by counsel prior to trial, provided a reasonable basis for believing the defenses based upon the petitioner's mental capacity *might have been* plausible.

These defenses, moreover, appear to be the *only* defenses possible in the case where the life of the petitioner was at stake. The physical and testimonial evidence left no doubt that the petitioner committed acts, which if accompanied by the requisite mental state, constituted serious crimes. Thus, the only things standing between Cecil Wood and the electric chair, other than the mercy of the Court, were potential defenses pertaining to his mental condition. Yet, despite indications that such defenses might be developed, counsel failed to take even the first step of requesting that a preliminary mental examination, available under Virginia law, be conducted. An indigent facing capital charges is entitled to a more vigorous defense than exhibited by the court-appointed counsel in the instant case.

There are substantial indications, moreover, that defenses could have been advanced had counsel explored these matters. Dr. Brookhart, staff psychologist at the Virginia State Penitentiary, examined the petitioner shortly after his conviction. At that time, Dr. Brookhart found no evidence of mental illness. The purpose of that examination, however, was only to ascertain the petitioner's ability to adapt to the institutional environment. The doctor, moreover, was not aware of the facts surrounding the offenses at the time of this examination. Dr. Brookhart testified that had he been consulted for the purpose of determining competency and if he had been informed of the details of the crime he would have recommended a thorough examination prior to trial. Dr. Davies, a psychiatrist, was of the opinion that the facts surrounding the crime are consistent with the medical condition termed alcoholic pathological intoxication. A person acting under this condition would be unable to distinguish right from wrong. This, of course, is highly relevant to any defense of insanity. *See Scales v. Commonwealth*, 214 Va. 728, 204 S.E.2d 273 (1974); *Thompson v. Commonwealth*, 193 Va. 704, 70 S.E.2d 284 (1952). The facts surrounding the crime, moreover, raise questions in Dr. Davies' mind as to whether the petitioner was competent at the time of trial. The respondent's own expert, Dr. Mullaney, while discounting the probability that pathological intoxication was involved in the crimes, would not rule out its possibility. Dr. Mullaney would draw no conclusions as to whether the petitioner was sane at the time of the offenses or competent to stand trial. Dr. Mullaney agreed with Drs. Brookhart and Davies that several questions remain concerning the petitioner's mental condition at the time of trial and at the time of the offenses and that if he had been consulted prior to trial, he would have recommended further study.

The death of counsel precludes any conclusive determination as to why more effort was not exerted in the defense of the petitioner. Failure to make inquiry into the possibility of a defense based on sanity or competency does not appear to be based upon trial strategy. The Court can envision no tactical reason why these defenses were not explored. In a letter to petitioner's instant counsel, dated May 4, 1972, trial counsel stated "I made no motion to declare him [Mr. Wood] insane because he is not insane, nor do I think he was temporarily insane on the night of the crime." It was, however, counsel's duty to ascertain whether a sanity defense was valid. *Coles v. Peyton, supra; Jones v. Cunningham, supra*. While counsel's personal opinion may, of course, be relevant, its viability is greatly dissipated in light of the failure to seek an expert opinion. [Footnotes omitted.] [10]

In the within case, Springer had no history of psychiatric treatment prior to the commission of the offense. Still, there was evidence, including Springer's past problems and the nature of the crime itself, which seemingly was sufficient to have alerted trial counsel to the possibility of successfully asserting an insanity defense. Moreover, the charge against Springer was serious, and the latter's defenses, other than insanity, were most insubstantial. Further, not only were those other defenses not inconsistent with an insanity defense, but one of them (that of lack of intent) could seemingly have been consistently advanced by psychiatric testimony hand in hand with presentation of an insanity defense.[11] Nor, apparently, were there other tactical risks inherent in the raising of an insanity defense. While Springer himself did not sug-

---

10. *Cf. Lawson v. Cox*, 317 F.Supp. 132 (W.D. Va.1970) (Dalton, J.).

11. Counsel have suggested, in response to a question from this Court, that, under Maryland procedure, an insanity defense may not be bifurcated from the rest of the trial. *But see,*

*Holmes v. United States*, 124 U.S.App.D.C. 152, 363 F.2d 281 (1966). If there is a retrial in this case, that possibility should be considered, though in this case, as indicated *supra*, an insanity defense hardly appears to conflict with any other defense.

gest an insanity defense, there is no indication that he in any way indicated any opposition to it. If Springer and his counsel had desired to explore the possibility of an insanity defense, lack of financial ability, if any, to pay for the same would seemingly not · have presented any difficulty. In *Bremer v. State*, 18 Md.App. 291, 307 A.2d 503 (1973), *cert. denied*, 415 U.S.· 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974), Judge Orth stated (at 316, 307 A.2d at 519):

In the light of the established procedure, the propriety of the statutory power in the court to order an examination of the mental condition of a defendant is evident.[7] Where he has pleaded insanity

[7] It may be that a trial court has inherent power to require a psychiatric examination of a defendant in an appropriate case. See *United States v. Albright*, 388 F.2d 719, 722–723 (4th Cir. 1968).

as a defense and presented evidence to meet the threshold question, the maintenance of a "fair state-individual balance" requires that the State be permitted to have him examined. When he is indigent the State is required to provide him with an impartial and competent psychiatrist at the State's expense. *Skinner v. State*, 16 Md.App. 116, 123–124, 293 A.2d 828. This may be done by making available to the defendant the impartial and competent psychiatric staff at the Clifton T. Perkins State Hospital. *Brown v. State*, 14 Md.App. 415, 423, 287 A.2d 62; *Swanson v. State*, 9 Md.App. 594, 600–602, 267 A.2d 270.[8]

[8] Although a defendant is not entitled to the services of an independent psychiatrist of his choice at State expense, he may, of course, employ one at his expense.

While 20–20 hindsight is always better than foresight and there can be no certainty that one or more psychiatrists would have testified at Springer's trial in accord with the opinion of Dr. Greenberg expressed in this case, and of course no certainty that an insanity defense could have been successfully asserted at trial, Springer's trial counsel's failure to discuss same with his client and to explore the possibility of advancing an insanity defense was outside the range of competence expected of

him as a defense attorney in a criminal case involving a very serious charge. Accordingly, Springer is entitled to the federal habeas corpus relief he seeks herein.